## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
          **Plaintiff,**

      v.

Criminal Action No. 06-248 (JDB)

JORGE RICARDO BARDALES
BOURDET
  also known as Jota,
ERIK DONAIRE CONSTANZA BRAN,
EDGAR ANTONIO CHIU SERRANO,
JUAN DANIEL DEL CID MORALES,
  also known as Ovidio Fajardo Aldana,
ALVARO AUGUSTIN MEJIA,
  also known as Edwin Renee Sapon Ruiz,
          **Defendants.**

## MEMORANDUM OPINION & ORDER

Defendants Erik Donaire Constanza Bran ("Constanza Bran"), Juan Daniel Del Cid

Morales ("Del Cid Morales"), and Alvaro Augustin Mejia ("Mejia") are Guatemalan nationals

who have each been charged with conspiracy to import five kilograms or more of cocaine into

the United States in violation of 21 U.S.C. §§ 960, 963 (2000), and aiding and abetting such a

conspiracy in violation of 18 U.S.C. § 2 (2000). Defendants were arrested in El Salvador on

September 27, 2006, and flown to the United States in the custody of agents of the United States

Drug Enforcement Administration ("DEA"). Presently before the Court are defendants' motions

to suppress statements made to DEA agents on September 27 and 28, 2006, as well as

defendants' motions for a bill of particulars and for severance of counts. The Court held an

1

evidentiary hearing on these motions on February 28, 2007, at which it heard testimony from defendant Del Cid Morales and two DEA special agents, Stephen Fraga and Jason Sandoval. For the reasons stated in this Memorandum Opinion, the Court will deny defendants' motions to suppress and motions for a bill of particulars, and will defer resolution of defendants' motions for severance of counts.

## FACTUAL BACKGROUND & FINDINGS

On August 17, 2006, a grand jury sitting in the United States District Court for the District of Columbia indicted defendants Constanza Bran, Del Cid Morales, and Mejia (then known only as "Juan Doe"), on one count of conspiracy, and aiding and abetting a conspiracy, to import five or more kilograms of cocaine into the United States. Two other defendants, Jorge Ricardo Bardales Bourdet and Edgar Antonio Chiu Serrano, were charged in the same indictment on two counts: the importation conspiracy and a second conspiracy to manufacture and distribute five kilograms or more of cocaine intending and knowing that the cocaine would be imported into the United States. Arrest warrants were issued for all five defendants on the same day. The circumstances of the September 27, 2006, arrests of defendants Constanza Bran, Del Cid Morales, and Mejia will be explored in some detail below. Neither Bourdet nor Serrano are in the custody of the United States; the Government now believes that Bourdet is dead.

## I.     The September 27, 2006, Arrests

According to testimony by Special Agent Fraga, the lead DEA case agent for this matter, the DEA began an investigation into an alleged drug trafficking conspiracy involving defendants in the spring of 2006. Tr. 145-46, 169. Based on this investigation, DEA believed at the time of the arrests that defendants had traveled from their home country of Guatemala to El Salvador on

2

at least two previous occasions to discuss with a confidential DEA informant the importation of

drugs into the United States. Tr. 157, 170-71; Gov't's Suppl. Opp'n to Mots. to Suppress at 1.

DEA was also aware prior to the arrests that defendants would be traveling to San Salvador, El

Salvador on September 27, 2006, to discuss the conspiracy at a meeting arranged by defendant

Bardales Bourdet. Tr. 171. At some point prior to September 26, 2006, DEA officials informed

Salvadoran law enforcement officials of defendants' plans to meet in El Salvador and of the

outstanding arrest warrants. Tr. 144-45, 171.

On September 26, 2006, Salvadoran law enforcement officials met with DEA agents at

the DEA's El Salvador office to discuss defendants' arrests. Tr. 45-46, 111, 142-44. Special

Agents Fraga and Sandoval, who were both present at this meeting, testified that the purpose of

the meeting was for DEA to share information about defendants with Salvadoran officials. Tr.

45, 111, 141-42. DEA and Salvadoran officials also discussed the manner in which defendants

would be arrested. Tr. 115. The agents further testified that the decision to arrest defendants, as

well as the tactical and administrative details of the arrests, were deferred to and made by the

Salvadoran officials. Tr. 46, 142-43, 171.

At approximately 1:30 p.m. the next day, defendants were arrested at a restaurant in San

Salvador. Tr. 126. Defendants were seized by an indeterminate number of armed Salvadoran

police officers dressed in black tactical gear and hoods. Tr. 102. Defendant Del Cid Morales

testified that men in black told him and the other defendants to throw themselves on the floor,

and that after he was pushed onto the floor, someone placed a foot on his back. Tr. 180. Del Cid

Morales also testified that after about ten or fifteen minutes he was handcuffed, placed in a

pickup truck with several Salvadoran officers, and driven to an airport, although at the time he

3

did not know who the officers were or where they were taking him. Tr. 180-81. According to Special Agents Fraga and Sandoval, although DEA agents from the El Salvador country office were present at the arrest, they were not directly involved in any tactical aspects of the operation. Tr. 39, 158. Special Agents Fraga and Sandoval were among those present, but they remained in a vehicle about 1000 to 2000 feet from the restaurant. Tr. 39-40, 158, 171-72. From this location, neither agent could see the restaurant or otherwise witness the arrests. Tr. 40, 171-72. The defendants were first transferred to United States custody on the tarmac of an airport in El Salvador. Tr. 17.

The Court credits Special Agents Fraga and Sandoval's description of defendants' arrests. It finds that the police action in which defendants were arrested was carried out by Salvadoran officials who were acting upon their own authority. Although there was coordination between Salvadoran officials and the DEA, there is no indication that United States officials directed the Salvadoran activities or otherwise controlled the arrests. The Court also finds that, while DEA agents were present at or near the arrest site, they did not directly effect the arrests.

## II.    The Transfer of Defendants to the United States

Special Agents Fraga and Sandoval first saw the defendants at approximately 3:00 p.m. at an airport in El Salvador, where a DEA airplane was waiting to fly them to the United States. Tr. 17, 167. All three defendants were wearing civilian clothing, Tr. 20, and had their hands cuffed in front of their bodies with chains around their waist, Tr. 49. Special Agent Fraga introduced himself to defendants on the tarmac, Tr. 167, but the agents did not engage defendants in any substantive conversation prior to boarding the airplane, Tr. 53.

According to Special Agent Sandoval, however, defendant Constanza Bran made one

4

voluntary and spontaneous statement immediately prior to boarding the aircraft; specifically, Constanza Bran commented in Spanish that he knew he was going to the United States because that is where they send corrupt Guatemalan officials. Tr. 52. Special Agent Sandoval, who speaks Spanish, translated this statement into English for Special Agent Fraga and then told Constanza Bran in Spanish that they could not talk further until they were in the air and he had been advised of his rights under the United States Constitution. Tr. 53. Defendants were then escorted onto the airplane by the pilots, who were also trained DEA agents. Tr. 50-51.

The airplane, a small turboprop, was equipped with seats for two pilots and six passengers. Tr. 19, 55. In addition to two pilots, the only people on the aircraft were the three defendants and Special Agents Fraga and Sandoval. Tr. 20. The passenger seats were arrayed in three rows of two, with the first two rows of seats facing each other and the last row of seats facing the back of the airplane. Tr. 55-56. At the beginning of the flight, Special Agent Sandoval sat in the second row next to Constanza Bran and across from Special Agent Fraga. Tr. 57. At that time, defendants Del Cid Morales and Mejia were seated in the last row of the plane and wore noise-reducing headphones. Tr. 56.

Approximately forty-five minutes after take-off, Special Agents Fraga and Sandoval administered Miranda warnings to Constanza Bran. Tr. 19; see Miranda v. Arizona, 384 U.S. 436 (1966). Special Agent Sandoval read from a Department of Justice rights-advisement form written in Spanish. Tr. 19-20. After reading each sentence aloud in Spanish, Special Agent Sandoval had Constanza Bran read the sentence to himself, asked Constanza Bran if he had any questions, and watched as Constanza Bran placed his initials in the margin next to the sentence. Tr. 19-20, 22-23. Special Agent Fraga, who knows rudimentary Spanish, at times asked

5

Constanza Bran directly in Spanish if he understood each line. Tr. 146-49. Constanza Bran signed the waiver form at 4:38 p.m. Tr. 22; Gov't. Ex. 1. Both agents testified that Constanza Bran appeared to understand his rights completely and never asked for an attorney. Tr. 22-23, 148. Sandoval remembered Constanza Bran as looking nervous, but he otherwise appeared to be in good health and did not ask for food, water, or for the use of a bathroom. Tr. 23-24.

After Constanza Bran signed the <u>Miranda</u> waiver, Special Agent Fraga, using Special Agent Sandoval as an interpreter, proceeded to ask Constanza Bran about his involvement in the alleged conspiracy. Tr. 25; Gov't Ex. 1. This conversation lasted approximately two to two-and-a-half hours. Tr. 85. The agents testified that defendant Constanza Bran appeared nervous at first and at one point became emotional about the impact of the arrest on his family; he had to be told to relax, at times firmly. Tr. 86, 151-52. Constanza Bran requested and was provided water at that time. Tr. 86. About thirty minutes into the questioning, Special Agent Fraga told Special Agent Sandoval that Constanza Bran's statements were inconsistent with previously gathered intelligence. Tr. 81, 150. According to the agents' testimony, although Special Agent Fraga may have appeared animated as he conveyed this information to Special Agent Sandoval, he did not raise his voice or otherwise threaten or gesture toward defendant. Tr. 82-83, 151-52. At this point in the conversation, which was described as an "impasse," Special Agent Sandoval told Constanza Bran that his answers were inconsistent with known evidence and asked him to speak truthfully. Tr. 97-98. Eventually, Constanza Bran began providing answers more in line with previously known information, and he appeared to relax. Tr. 98.

At some point during the impasse with Constanza Bran, the pilots announced that the plane was flying over Guantanamo Bay. Tr. 85, 122. Agent Sandoval testified that he relayed

6

this information to Bran, who then nervously asked if he was going to be taken there. Tr. 85. Sandoval testified that he answered with a jocular "yeah, right," before telling Bran that they were actually going to Florida. Id.

The plane landed in Fort Lauderdale, Florida at 10:00 p.m. Tr. 87. Defendants were processed by Immigration and Customs Enforcement and given water and food out of vending machines. Tr. 32, 133. This was the first time while in United States custody that the defendants had access to food, and Agent Sandoval testified that given the late hour, vending machines were the best they could do. Tr. 133. At 11:30 p.m., the plane left Florida for Washington, D.C. Tr. 87.

Defendant Del Cid Morales was questioned during this second leg of the flight. Tr. 30. Special Agent Sandoval testified that he followed the same procedure for advising defendant Del Cid Morales of his Miranda rights that he had used with Constanza Bran. Special Agent Sandoval read the Department of Justice waiver form to Del Cid Morales line by line in Spanish, allowed Del Cid Morales to review each line himself, asked Del Cid Morales if he understood, had him initial the form in the margin next to each line, and then watched him sign the voluntary waiver statement at the bottom of the form. Tr. 26, 29, 120-22. Del Cid Morales completed the waiver of his rights at 12:09 a.m. on September 28, 2006. Tr. 118; Gov't Ex. 2. Special Agent Sandoval testified that during this process Del Cid Morales appeared relaxed, and he did not ask for a lawyer or for any food, water, or the use of a bathroom. Tr. 27. Del Cid Morales made incriminating statements to the DEA agents during an interview that lasted approximately sixty to ninety minutes. Tr. 28, 105.

Defendant Del Cid Morales testified during the suppression hearing, and his testimony

7

directly conflicts with the testimony of Agents Sandoval and Fraga in several respects. Upon direct examination, defendant Del Cid Morales stated that he was only shown the Miranda waiver form after he was interrogated, and that while he was being interrogated he did not understand that he had a right to remain silent. Tr. 185. He also testified that, although his initials appear on the waiver form, they are not written in his handwriting. Tr. 190. Defendant further stated that Agent Sandoval told him that if he did not tell the truth he would be taken to Guantanamo Bay, although at the time he did not know what Guantanamo Bay was. Tr. 184, 191. Agent Sandoval explicitly denied talking to Del Cid Morales about Guantanamo Bay. Tr. 122. During cross-examination, Del Cid Morales acknowledged that Special Agent Sandoval spoke to him politely and respectfully in Spanish. Tr. 189.

Faced with this conflicting testimony, the Court has assessed the credibility of each witness and concludes that, although Del Cid Morales had a confident and seemingly forthright demeanor on the witness stand, it cannot credit his account with respect to the timing of the Miranda warnings, the handwritten initials, or the Guantanamo Bay remark. The evidence is undisputed that: Del Cid Morales was the first defendant questioned during the flight from Fort Lauderdale to D.C.; he was only questioned on this second flight; the plane left Florida at 11:30 p.m.; Del Cid Morales signed the bottom of the waiver form at 12:09 a.m.; Del Cid Morales's interview lasted between sixty and ninety minutes; and, as explained below, Mejia waived his Miranda rights at 1:53 a.m. Given these undisputed facts, it would have been impossible for the agents to conduct even a sixty minute interview between the time the plane left Florida and the time Del Cid Morales was fully advised of his rights. Instead, these undisputed facts fully support the agents' testimony that Del Cid Morales was interviewed after he signed the waiver

8

form. Furthermore, it is difficult for the Court to believe that Special Agents Fraga and Sandoval, both of whom have extensive training and experience in interrogation techniques, including giving Miranda warnings, Tr. 106, 146-47, would properly advise defendants Constanza Bran and Mejia of their Miranda rights but neglect to do so for defendant Del Cid Morales. As to Del Cid Morales's comment regarding the initials in the margins of the form, the Court notes that it was stated rather unconvincingly, almost in the manner of an afterthought. The Court also believes Agent Sandoval's testimony that he only mentioned Guantanamo Bay to Constanza Bran, who was being interviewed when the plane actually flew over Cuba on the leg from El Salvador to Florida. The alleged threatening comment is further at odds with Del Cid Morales's description of Special Agent Sandoval's tone as respectful and polite, and with the overall impression gleaned from both parties that the conversation was impasse-free.

Defendant Mejia was the last defendant to be questioned by Special Agents Fraga and Sandoval. During the final portion of the flight from Fort Lauderdale to Washington, Special Agent Sandoval read Mejia his Miranda rights from the Spanish-language waiver form, again stopping after each line to allow Mejia to read it for himself, acknowledge that he understood, and write his initials at the end of each sentence. Tr. 29-31; Gov't Ex. 3. Mejia signed the form at 1:53 a.m. on September 28, 2006. Tr. 29, Gov't Ex. 3. Agent Sandoval testified that Mejia looked healthy and relaxed during the reading of his rights, and that he did not ask for an attorney or for anything to eat or drink or to use the bathroom. Tr. 31. Although all substantive conversation with Mejia took place after the Miranda advisement session, Tr. 31, Special Agent Sandoval asked Mejia for his name concurrent to advising him of his rights. Tr. 129.

Once defendants arrived in Washington, they were processed and brought before a

9

magistrate judge of this Court.  No further substantive questioning took place.  Tr. 33.

## ANALYSIS

### I.     Defendants' Motions to Suppress

Defendants Del Cid Morales and Mejia have filed motions asking the Court to suppress

any statements they may have made to DEA agents Fraga and Sandoval while en route to

Washington, D.C. from El Salvador.  Defendant Constanza Bran filed a separate motion

requesting the suppression of the statement he made to Agent Sandoval immediately before

boarding the DEA plane in addition to any statements he made during the flight.  Although

defendant Constanza Bran's motion does not raise every argument made by the other defendants,

the Court will treat all arguments as relating to all three defendants.

### A.     Mansfield Amendment

Defendants contend that their statements must be suppressed because they were the fruit

of an arrest that violated the Mansfield Amendment, Pub. L. No. 94-329, § 504(b), 90 Stat. 729,

764 (1976) (codified as amended at 22 U.S.C. § 2291(c) (2000)).  The Mansfield Amendment

provides that "No officer or employee of the United States may directly effect an arrest in any

foreign country as part of any foreign police action with respect to narcotics control efforts,

notwithstanding any other provision of law."  § 2291(c)(1).  As the D.C. Circuit has emphasized,

the Mansfield Amendment only prohibits United States officers from "directly effect[ing]" an

arrest.  United States v. Mejia, 448 F.3d 436, 443 (D.C. Cir. 2006).  Defendants' arrests were not

directly effected by United States officers; rather, the Salvadoran police exercised complete

control and authority over the direct police action in which defendants were taken into custody.

The Mansfield Amendment simply does not apply.

10

Defendants concede that defendants' arrests were carried out by Salvadoran officials, but they argue that the Mansfield Amendment was nonetheless violated in two ways. First, they contend that United States officers directly effected the arrest of defendants when they took custody of defendants at the airport in El Salvador. Defendants acknowledge that the logical result of their argument would require any transfer of custody to occur either in the United States or in international territory. Regardless, their argument is foreclosed by Mejia, in which the defendants were arrested in Panama by Panamanian authorities and then transferred into DEA custody at an airport in Panama City. 448 F.3d at 439. The court of appeals held that the defendants' "claim that the Mansfield Amendment was violated fails on its face" because "the Panamanian authorities conducted the direct police action during which the defendants made a transition from liberty to custody." Id. at 443 (internal quotation marks omitted). It can therefore be inferred that the later transfer of the Mejia defendants from Panamanian to American custody did not implicate the Amendment. Accordingly, the post-arrest transfers of defendants in this case from Salvadoran to American custody did not constitute "directly effect[ed] arrest[s]" under the terms of the Mansfield Amendment.

Second, defendants note that the Government has not presented evidence with respect to whether the United States ambassador to El Salvador approved DEA's presence at the arrest.[1] They contend that such permission is required by paragraph two of the Amendment (herein referred to as the "presence safe harbor"), which clarifies that "Paragraph (1) does not prohibit an officer or employee of the United States, with the approval of the United States chief of mission,

---

[1]The Government apparently concedes that agents were present at the arrest for purposes of the Mansfield Amendment.

11

from being present when foreign officers are effecting an arrest or from assisting foreign officers who are effecting an arrest." § 2291(c)(2).

The presence safe harbor is written in the form of a clarification. In explaining what the main text of the Amendment "does not prohibit," the provision makes clear that presence and assistance with ambassadorial approval is acceptable. See H.R. Rep. No. 101-342, pt. 1, at 23 (1989) ("Section 488 clarifies what has long been U.S. policy . . . : that DEA agents . . . may be present and assist at arrests carried out by their foreign counterparts if the U.S. ambassador approves . . . ."). However, the presence safe harbor contains no independent prohibition of its own -- it does not state that a failure to fulfill its terms (i.e., to secure approval of the ambassador) constitutes a violation of the statute. Therefore, defendants' argument necessarily assumes that presence at or assistance with an arrest is otherwise encompassed within the definition of "directly effect[ing]" an arrest.

The Court does not read "directly effect" so broadly, as otherwise any participation in a foreign police action involving an arrest would be prohibited unless expressly approved. Yet in Mejia, "copies of the warrants were provided to Panamanian law enforcement officials" by their American counterparts prior to defendants' arrests, 448 F.3d at 439. No mention was made of ambassadorial approval for this assistance; nevertheless, the court of appeals found the Mansfield Amendment was not applicable "[b]y its terms." Id. at 443. More fundamentally, the adverb "directly" means "without any intervening agency or instrumentality" or "in independent action without any sharing of authority or responsibility." Webster's Third New International Dictionary 641 (1993). A United States agent providing assistance to a foreign official or merely being present as a foreign official makes an arrest is more accurately described, at most, as

12

indirectly effecting the arrest, "indirectly" being defined as "through some intervening person or thing." The Oxford English Dictionary (2d ed. 1989). Finally, the Mansfield Amendment contains two additional provisions that are both explicitly labeled as "exceptions" to paragraph one, meaning they permit activity that would otherwise clearly be prohibited. See § 2291(c)(3) ("Exception for exigent, threatening circumstances: Paragraph (1) does not prohibit an officer or employee from taking direct action to protect life or safety if exigent circumstances arise . . . ." (emphasis added)); § 2291(c)(4) ("Exception for maritime law enforcement: . . . paragraph (1) does not apply with respect to maritime law enforcement operations . . . ."). In contrast, § 2291(c)(2) is titled "Participation in arrest actions," further suggesting that the provision's purpose is to list activity that should not be considered direct action under paragraph one. For these reasons, the Court does not read the safe harbor provision as bringing mere presence at an arrest site within the fold of prohibited direct actions, and finds that defendants' arrests did not violate the Mansfield Amendment.

Even assuming arguendo that the arrests did violate the Mansfield Amendment, moreover, suppression of defendants' subsequent statements is nonetheless unwarranted. The Mansfield Amendment is silent as to remedies for its breach, and no court has ever implied a remedy for a defendant alleging its violation. See United States v. Zabaneh, 837 F.2d 1249, 1261 (5th Cir. 1988) ("Congress has not provided sanctions or penalties by way of relief for persons arrested in contravention of § 2291(c)(1)."), cited in Mejia, 448 F.3d at 444; United States v. Bridgewater, 175 F. Supp. 2d 141, 146 (D.P.R. 2001) ("The Mansfield Amendment regulates government action prescriptively; it does not provide repercussions for violations of the Amendment."); see also United States v. Montalvo-Murillo, 495 U.S. 711, 717 (1990) ("There is

13

no presumption or general rule that for every duty imposed upon the court or the Government and its prosecutors there must exist some corollary punitive sanction for departures or omissions, even if negligent.").

Moreover, lower courts should be hesitant to apply the exclusionary remedy in novel contexts. The Supreme Court has "cautio[ned] against expanding" the exclusionary rule because of its "substantial social costs." Hudson v. Michigan, 126 S. Ct. 2159, 2163 (2006) (internal quotation marks omitted); see also Sanchez-Llamas v. Oregon, 126 S. Ct. 2669, 2680 (2006) ("'[O]ur cases have repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the rule.'" (alteration in original) (quoting Pa. Bd. of Probation & Parole v. Scott, 524 U.S. 357, 364-65 (1998)). Thus, "suppression is warranted only where the rule's remedial objectives are thought most efficaciously served." Sanchez-Llamas, 126 S. Ct. at 2680 (internal quotation marks omitted). Furthermore, the Court has "applied the exclusionary rule primarily to deter constitutional violations," id., and in the few cases in which evidence has been suppressed based on statutory violations, "the excluded evidence arose directly out of statutory violations that implicated important Fourth and Fifth Amendment interests." Id. at 2681.

The Supreme Court's recent decision in Sanchez-Llamas is particularly instructive. There, the Court held that suppression of a confession is an inappropriate remedy for the Government's failure to inform a defendant of his consular-notification rights under the Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 ("Vienna Convention"). Id. at 2682. The Court explained that the violation of the right to consular notification "is at best remotely connected to the gathering of evidence" and "unlikely, with any

14

frequency, to produce unreliable confessions." Id. at 2681. Additionally, the interests that defendants claimed were served by the consular-notification provision, i.e., a defendant's understanding of his legal options, are also protected by the Fifth and Sixth Amendments. Id. at 2681-82. Given the relatively meager incentives for authorities to violate the Vienna Convention, the Court believed that the exclusionary rule would be a "vastly disproportionate remedy." Id. at 2681.

Even more so than the consular-notification requirement, the Mansfield Amendment is far removed from the concerns of a defendant's Fourth and Fifth Amendment rights. The Amendment speaks to the proper role of American officials in foreign police actions; it was originally intended "to 'insure that U.S. personnel do not become involved in sensitive, internal law enforcement operations which could adversely affect U.S. relations with that country.'" United States v. Green, 671 F.2d 46, 53 n.9 (1st Cir. 1982) (quoting S. Rep. No. 94-954, at 55 (1976), reprinted in 1976 U.S.C.C.A.N. 1373, 1431). And, like the failure to inform a defendant of his consular-notification rights, a violation of the Mansfield Amendment is unlikely to produce unreliable confessions. Defendants are, of course, still entitled to the protections of the Fifth and Sixth Amendment. Certainly, in this case, all three defendants were adequately advised of their constitutional rights before providing statements to the DEA agents.[2] Suppression of the statements would therefore be a disconnected and drastic remedy for DEA's failure to secure the ambassador's approval of the presence of agents at the arrests.[3]

---

[2]Constanza Bran's spontaneous pre-flight comment to Agent Sandoval and Mejia's pre-warning statement of his name are discussed further below.

[3]Although defendants argue that a violation of the Mansfield Amendment constitutes a violation of the Fifth Amendment in its own right, the Supreme Court has suggested that the

### B.    Joint-venture Doctrine

Defendants argue, without citation to any legal authority, that because their arrests were the product of a joint venture between Salvadoran and American forces, any violations of Salvadoran law that occurred during the arrest would therefore also violate the Fourth Amendment. Defendants apparently refer to the joint-venture doctrine, which is an exception to the general principle that "the exclusionary rule does not normally apply to foreign searches conducted by foreign officials." United States v. Mount, 757 F.2d 1315, 1317 (D.C. Cir. 1985); see also, e.g., Stonehill v. United States, 405 F.2d 738, 743 (9th Cir. 1968). Under the doctrine, the "exclusionary rule does apply to a foreign search if American officials or officers participated in some significant way." Mount, 757 F.2d at 1318 (emphasis added); see also Berlin Democratic Club v. Rumsfeld, 410 F. Supp. 144, 154 (D.D.C. 1976) ("The [F]ourth [A]mendment does apply to actions by foreign officials if United States officials participated in those actions 'so as to convert them into joint ventures between the United States and the foreign officials.'" (quoting Stonehill, 405 F.2d at 743)). And, in at least some circuits, "compliance with foreign law alone determines whether [a] search violated the Fourth Amendment." United States v. Barona, 56 F.3d 1087, 1091 n.1 (9th Cir. 1995).

The incantation of the words "joint venture" cannot confer upon defendants Fourth Amendment rights that they do not otherwise possess. Before a court can apply the joint-venture doctrine, which "is based solely on the Fourth Amendment, [defendants] must first show that they are among the class of persons that the Fourth Amendment was meant to protect." Id. at

---

means by which a defendant is brought within the court's jurisdiction, even if by forcible abduction, does not preclude a defendant from receiving "due process of law." Frisbie v. Collins, 342 U.S. 519, 522 (1952). Such is the case here.

1093. And the Supreme Court has firmly held that non-resident aliens who have no voluntary connection to the United States cannot invoke the Fourth Amendment with respect to foreign actions by federal officials. See United States v. Verdugo-Urquidez, 494 U.S. 259, 274-75 (1990). Although Verdugo-Urquidez addressed the legality of a search and seizure of an alien's property rather than an alien's person, the constitutional principles announced in the decision apply equally in both contexts. See, e.g., 494 U.S. at 265 (suggesting that "the people" protected by the Fourth Amendment "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community"); id. at 267 ("There is likewise no indication that the Fourth Amendment was understood by contemporaries of the Framers to apply to activities of the United States directed against aliens in foreign territory or in international waters."). Thus, defendants were not protected by the Fourth Amendment at the time of their arrests, and hence they are not entitled to suppression of their statements under the joint-venture doctrine.

### C.    Forcible Rendition

Defendants argue that the manner in which they were brought from El Salvador to the United States violated international treaties and United States law. The United States and El Salvador are parties to a bilateral extradition treaty, see Treaty between the United States and Salvador for the Mutual Extradition of Fugitives from Justice, Apr. 18, 1911, 37 Stat. 1516 ("U.S.-El Salvador Treaty"), as well as a United Nations Convention that makes the distribution of cocaine an extraditable offense, see United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, art. 6 para. 2, opened for signature Dec. 20, 1988, S. Treaty Doc. No. 101-4 (1990). In the words of the Government, however, "defendants were

17

not extradited from El Salvador; rather, their presence in the United States was acquired outside the terms of the treaty between the United States and El Salvador." Gov't's Suppl. Opp'n to Mots. to Suppress at 1. The thrust of defendants' argument, then, is that they <u>could</u> have been extradited from El Salvador, and thus they should have been; the use of other methods of rendition, they say, violated the extradition treaty. Rather than attack this Court's jurisdiction, however, defendants frame the issue as a deprivation of their Fourth and Fifth Amendment rights and ask for suppression of the fruits of the seizure.

For better or worse, defendants are not the first to challenge a rendition that took place outside the terms of an extradition treaty. In <u>United States v. Alvarez-Machain</u>, 504 U.S. 655 (1992), the Supreme Court employed the following framework to analyze whether a defendant's forcible abduction from Mexico deprived the court of jurisdiction:

> [O]ur first inquiry must be whether the abduction of respondent from Mexico violated the Extradition Treaty between the United States and Mexico. If we conclude that the Treaty does not prohibit respondent's abduction, the rule in <u>Ker</u> applies, and the court need not inquire as to how respondent came before it.

504 U.S. at 662. The "rule in <u>Ker</u>" v. <u>Illinois</u>, 119 U.S. 436 (1886), affirms

> that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.' . . . [D]ue process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.

<u>Alvarez-Machain</u>, 504 U.S. at 661-62 (internal quotation marks omitted). This Court will apply the <u>Alvarez-Machain</u> framework to defendants' Fifth Amendment argument;[4] hence, if their

---

[4]Defendants reliance on the Fourth Amendment in this context is unavailing because, as explained above, defendants do not possess Fourth Amendment rights with respect to their

rendition did not violate the extradition treaty between the United States and El Salvador, <u>Ker</u>
instructs that due process of law was not infringed.

In assessing whether the Government's actions violated the extradition treaty between the
United States and El Salvador, defendants' case is indistinguishable from <u>Mejia</u>, which in turn
was controlled by <u>Alvarez-Machain</u>. In <u>Alvarez-Machain</u>, the Supreme Court determined that
the defendant's forcible abduction did not violate the United States-Mexico extradition treaty, the
terms of which "say[] nothing about the obligations of the United States and Mexico to refrain
from forcible abductions of people from the territory of the other nation, or the consequences
under the Treaty if such an abduction occurs." 504 U.S. at 663. Moreover, the Court refused to
interpret the treaty "so as to include an implied term prohibiting prosecution where the
defendant's presence is obtained by means other than those established by the Treaty." <u>Id.</u> at 666.
In <u>Mejia</u>, the D.C. Circuit was called upon to interpret the extradition treaty between the United
States and Panama. 448 F.3d at 443. The court found that, "[l]ike the U.S.-Mexico treaty, the
U.S.-Panama treaty contains no prohibition against procuring the presence of an individual
outside the terms of the treaty -- let alone one barring the signatories from informally cooperating
with each other as they did in this case." <u>Id.</u> Without a basis upon which to distinguish the
treaties, the court held that it was bound by <u>Alvarez-Machain</u>. <u>Id.</u>

So, too, here. Defendants have not suggested, and this Court has not found, any basis
upon which to distinguish the United States's extradition treaty with El Salvador from its treaties
with Mexico and Panama. <u>Compare</u> U.S.-El Salvador Treaty, <u>with</u> Extradition Treaty,
U.S.-Mex., May 4, 1978, 31 U.S.T. 5059, <u>and</u> Treaty Providing for the Extradition of Criminals,

---

seizure on foreign soil.

19

U.S.-Panama, May 25, 1904, 34 Stat. 2851. Nothing in the U.S.-El Salvador Treaty prohibits or otherwise speaks to the procurement of an individual outside the terms of the treaty, and this Court sees no reason to infer such a prohibition. Accordingly, the Court finds that defendants' renditions did not violate the applicable extradition treaty, and therefore that defendants' due process rights were not compromised by the renditions.

### D.    Fifth Amendment Due Process

As an alternative basis for suppression, defendants argue that their statements were made involuntarily in contravention of the Fifth Amendment's Due Process Clause. Due process is violated by the use in court of statements made in response to custodial interrogation by an individual whose "will has been overborne and his capacity for self-determination critically impaired." Culombe v. Connecticut, 367 U.S. 568, 602 (1961). "In determining whether a defendant's will was overborne in a particular case, [courts] ha[ve] assessed the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). "Those potential circumstances include not only the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; education; physical condition; and mental health. They also include the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation." Withrow v. Williams, 507 U.S. 680, 693-94 (1993) (citations omitted). Furthermore, "when a confession challenged as involuntary is sought to be used against a criminal defendant at his trial . . . the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary." Lego v. Twomey, 404 U.S. 477, 489 (1972).

1.    Constanza Bran

Turning first to defendant Constanza Bran, the circumstances of his interrogation and defendant's personal characteristics suggest that his statements were made voluntarily. The actual interview was not overly lengthy, and the agents provided defendant with a water bottle from their own supply. Although the airplane in which the questioning took place was small, there was no evidence to indicate that it was uncomfortable, and defendant wore noise-reducing headphones to dampen the sound of the propellers when he was not being questioned. Nor was there undue coercion on the part of the DEA agents. Special Agent Sandoval conducted the interview in Spanish at a conversational tone, after advising defendant of his rights. With respect to the "impasse" that occurred during the interrogation, the Court credits the agents' testimony that they did not raise their voices or make threats or gestures toward defendant. The Court also credits Special Agent Sandoval's testimony that the conversation regarding Guantanamo Bay ended with defendant being reassured that he was en route to the United States. Furthermore, Constanza Bran's behavior did not suggest that his will had been overborne. Although he appeared nervous and at one point became emotional during the first part of the interview, he was not overly so. Constanza Bran is an educated adult, and he has not challenged the agents' testimony that he completely understood the Miranda warnings as they were explained to him.

Defendant highlights several facts that he argues cut against the voluntary nature of his statements. First, Del Cid Morales testified that Constanza Bran was pushed to the floor by Salvadoran police during his arrest; defendant also points to a lack of evidence concerning his treatment by Salvadoran authorities before being transferred to United States custody. Even accepting that Constanza Bran was pushed to the floor by the Salvadoran police, a not-unusual

21

occurrence during arrests even in this country, suggestions that he was mistreated before arriving at the airport are contradicted by his appearance of good health when the DEA agents first saw him on the tarmac. Second, defendant attacks the reliability of his statements as they are recorded in Agent Fraga's report because the report omits certain exchanges that occurred during the interview. The Court does not agree that the omissions necessarily imply the inaccuracy of information that is contained in the report; notably, defendants have not claimed that the report's actual contents are inaccurate. Moreover, "there is no constitutional requirement that confessions be recorded by any particular means." United States v. Yunis, 859 F.2d 953, 961 (D.C. Cir. 1988). Finally, it is undisputed that defendant was not advised of his right to consular notification under the Vienna Convention. See Vienna Convention art. 36(1)(b). Although the failure to inform a defendant of his consular rights cannot provide the sole basis for suppression, see Sanchez-Llamas, 126 S. Ct. at 2682, a "defendant can raise an Article 36 claim as part of a broader challenge to the voluntariness of his statements to police," id. Based on the totality of the circumstances, however, the Court finds that Constanza Bran's statements were made voluntarily.

>    2.    Del Cid Morales

The Court also finds that the Government has met its burden with respect to the voluntary nature of Del Cid Morales's statements. Although he had been in custody for more than ten hours by the time of his interview, Del Cid Morales was provided with food and water in Fort Lauderdale and had been allowed to sleep. The actual interrogation lasted only sixty to ninety minutes, and was conducted in a respectful manner. Defendant was properly informed of his rights under the United States Constitution, although not under the Vienna Convention. Despite

defendant's attempts to portray himself as an uneducated pig farmer who could not understand his rights, defendant's demeanor on the witness stand was entirely the opposite. Del Cid Morales, a former Guatemalan police officer, was calm and composed, and he responded quickly and easily to the questions posed to him. Furthermore, although he testified that he was in pain because of recent spinal surgery, Tr. 183, he was sufficiently comfortable to sleep during the flight, Tr. 190, and the DEA agents testified that he looked relaxed during his interview. Cf. Yunis, 859 F.2d at 963 ("When courts evaluate physical [impacts of a medical condition], they often look to a defendant's behavior to determine the extent of his distress."). Based on the totality of the circumstances, the Court finds that Del Cid Morales made his statements voluntarily.

      3.     Mejia

      Many of the observations the Court has made with respect to the interrogations of defendants Constanza Bran and Del Cid Morales also apply to the questioning of defendant Mejia. DEA agents advised Mejia of his rights and provided him with food and water prior to the interrogation. Mejia, an apparently intelligent adult, has not suggested that he did not understand his rights. The interview was the shortest of the three, lasting only thirty minutes. Mejia argues that his statements were made involuntarily because he was woken up in the early morning hours in order to be questioned. On the other hand, these facts demonstrate that Mejia had been allowed to sleep and felt comfortable enough to do so. Although defendant was not advised of his consular rights, the Court finds that, based on the totality of the circumstances, Mejia's statements were made voluntarily.

      **E.**     **Fifth Amendment Privilege Against Self-Incrimination**

Defendant Constanza Bran moves for the suppression of the statement he made to Special Agent Sandoval while boarding the plane and prior to receiving <u>Miranda</u> warnings. Defendant Mejia, who was asked at the outset of his in-flight interview to state his name before being advised of his rights, argues that the statement of his name should also be suppressed.

The Fifth Amendment provides that no "person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Statements made by a defendant during custodial interrogation therefore may not be introduced by the prosecution at trial "unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." <u>Miranda,</u> 384 U.S. at 444. Those safeguards most often take the form of <u>Miranda</u> warnings, which include advising the defendant "prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." <u>Id.</u> at 479. But "the special procedural safeguards outlined in <u>Miranda</u> are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." <u>Rhode Island v. Innis,</u> 446 U.S. 291, 300 (1980). For purposes of <u>Miranda</u>, interrogation includes both express questioning of the defendant and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Id.</u> at 301.

With respect to Constanza Bran's comment to Special Agent Sandoval, the Court finds that the statement was not made in response to interrogation. Up to that point, the only words spoken and actions taken by Special Agents Sandoval and Fraga toward Constanza Bran were

24

those normally attendant to custody.  Constanza Bran's statement was made voluntarily and

spontaneously, and therefore is "admissible without Miranda warnings." United States v.

Samuels, 938 F.2d 210, 214 (D.C. Cir. 1991); see also United States v. Gonzalez, 875 F.2d 875,

881 (D.C. Cir. 1989) (same).

Mejia's statement requires a different analysis.  Special Agent Sandoval testified that he

asked Mejia his name concurrently to advising Mejia of his rights and before initialing the form.

Tr. 129, 132.  The Court therefore finds that Mejia stated his name before Miranda warnings

were completed.  In order to qualify for the Fifth Amendment privilege against self-incrimination

that Miranda warnings are designed to protect, however, "a communication must be testimonial,

incriminating, and compelled." Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 189 (2004);

cf. Pennsylvania v. Muniz, 496 U.S. 582, 590 (1990) ("Because Muniz was not advised of his

Miranda rights until after the videotaped proceedings at the booking center were completed, any

verbal statements that were both testimonial in nature and elicited during custodial interrogation

should have been suppressed.").  The question before this Court is whether Mejia's statement of

his name is sufficiently incriminating to implicate the privilege.

The privilege against self-incrimination "not only extends 'to answers that would in

themselves support a conviction . . . but likewise embraces those which would furnish a link in

the chain of evidence needed to prosecute the claimant.'" Ohio v. Reiner, 532 U.S. 17, 20 (2001)

(quoting Hoffman v. United States, 341 U.S. 479, 486 (1951)).  The Supreme Court has observed

that "[a]nswering a request to disclose a name is likely to be so insignificant in the scheme of

things as to be incriminating only in unusual circumstances."[5]  Hiibel, 542 U.S. at 191.  It noted

as well, however, that "a case may arise where there is a substantial allegation that furnishing

identity . . . would have given the police a link in the chain of evidence needed to convict the

individual of a separate offense."[6]  Id.

This is not such a case.  It is difficult to see how the revelation of Mejia's true name

furnished a link in the chain of evidence with respect to his involvement in the conspiracy with

which he is charged.  The August 17, 2006, indictment and arrest warrant both list defendant

number five -- the person now known to be Mejia -- as "Juan Doe, a/k/a Edwin Renee Sapon

Ruiz."  All of the evidence indicates that the name "Mejia" was unknown to DEA up to the time

that defendants were rendered into United States custody.  Special Agent Sandoval testified that

Special Agent Fraga identified Mejia as John Doe prior to boarding the plane.  Tr. 128.  Thus, the

fact that he was known to investigators and listed in the indictment only as a John (or Juan) Doe

actually supports the conclusion that DEA's ability to connect Mejia to, and charge him with, the

conspiracy alleged in the indictment did not require knowledge of his true name.

Although Mejia has suggested that he might have been implicated in the conspiracy by

name during the course of Constanza Bran's interview, the record before the Court shows only

_____

[5]The Supreme Court has suggested, for example, that an individual's name is often not
protected by the privilege against self-incrimination because "'fact[s] the State could readily
establish' may render 'any testimony regarding existence or authenticity [of them] insufficiently
incriminating.'"  Hiibel, 542 U.S. at 191 (alterations in original) (quoting Balt. City Dep't of
Social Servs. v. Bouknight, 493 U.S. 549, 555 (1990)).  That may be true here as well, but this
Court cannot say so with certainty on the record before it.

[6]The Supreme Court was referring to an offense separate from the violation of a "stop and
identify" law; the defendant in Hiibel refused to provide his name during a police stop and was
thereafter convicted of violating Nevada's stop-and-identify statute.  Id. at 181-82.

that Constanza Bran told the DEA agents Mejia's name and how long he had known him. Tr.

132-33. Furthermore, Special Agent Fraga had already learned Mejia's name prior to boarding

the plane, Tr. 163, and thus prior to speaking with Constanza Bran. Hence, given the record at

this time, Mejia has not made a "substantial allegation," see Hiibel, 542 U.S. at 191, that stating

his identity furnished a link in the chain of evidence in this case. It is, of course, his burden to do

so. Accordingly, Mejia's statement was not sufficiently incriminating to warrant protection under

the privilege against self-incrimination, and it may be admitted at trial, should the Government

seek to introduce it.[7]

### F.    Sixth Amendment Right to Counsel

Defendants argue that their statements "were seized in violation of the defendants' post

indictment right to counsel" and that any waiver of that right was involuntary and uninformed.

Del Cid Morales's Mot. to Suppress at 5. The Sixth Amendment prohibits the use at trial of

statements that are deliberately elicited from a defendant in the absence of counsel after he has

been indicted. Massiah v. United States, 377 U.S. 201, 206 (1964). The Sixth Amendment right

to counsel can be waived, however, so long as the defendant does so voluntarily, knowingly, and

intelligently. "[W]hen the government opposes a motion to suppress a confession, it need prove

waiver only by a preponderance of the evidence. Thus, the government must show it is more

---

[7]It is also doubtful that the request for Mejia's name constitutes "interrogation" for purposes of Miranda. Not all express questioning meets the definition of interrogation; rather, "only questions that are reasonably likely to elicit incriminating information in the specific circumstances of the case constitute interrogation within the protections of Miranda." United States v. Bogle, 114 F.3d 1271, 1275 (D.C. Cir. 1997). "This is an objective inquiry; the subjective intent of the officer is relevant but not dispositive." Id. For the reasons explained above, there is no evidence in the record that, at the time the question was posed, the DEA agents should have had reason to believe (or, for that matter, did believe) that Mejia's name held incriminating value.

probable than not that [the defendant's] waiver of rights reflected an uncoerced choice and the requisite level of comprehension." United States v. Yunis, 859 F.2d 953, 962 (D.C. Cir. 1988) (citations and internal quotation marks omitted); see id. at 967 (applying this Fifth Amendment standard to waiver of Sixth Amendment rights).

A defendant's waiver of his Sixth Amendment right to counsel is voluntary when, based on the totality of the circumstances, "it was the product of a free and deliberate choice rather than intimidation, coercion or deception." Id. at 961. And, "[s]o long as the accused is made aware of the dangers and disadvantages of self-representation during postindictment questioning, by use of the Miranda warnings, his waiver of his Sixth Amendment right to counsel at such questioning is knowing and intelligent." Patterson v. Illinois, 487 U.S. 285, 300 (1988) (internal quotation marks omitted). Although a court must take into account "the education, experience and conduct of the accused" -- including a defendant's "alienage and unfamiliarity with the American legal system" -- when determining whether a waiver was knowing and intelligent, "the significance of these factors will be limited to determining whether a defendant knew and understood the warnings that were read to him." Yunis, 859 F.2d at 965 (internal quotation marks omitted). Notably, in United States v. Yunis the D.C. Circuit concluded that a non-English speaking, alien defendant knowingly and voluntarily waived his right to counsel after receiving oral and written translations of the Miranda warnings and indicating his comprehension of them line by line. Id. at 966-67.

The totality of the circumstances surrounding defendants' waivers of their right to counsel demonstrate that they were made voluntarily, knowingly, and intelligently. Defendants were not threatened, coerced, or otherwise placed in distress during the reading of their Miranda rights.

28

Special Agent Sandoval carefully and patiently followed the advisement procedures that the D.C. Circuit found sufficient in Yunis: he read the warnings aloud in defendant's native language and ascertained their comprehension of each line. Furthermore, defendants have not presented any evidence to contradict the agents' testimony that they are reasonably intelligent adults who fully understood their rights.[8] Accordingly, the Court finds that defendants waived their Sixth Amendment rights prior to interrogation.

## II.     Motion for a Bill of Particulars

Defendants ask for a bill of particulars that details any words, acts, or deeds by defendants that the Government believes support the conspiracy charge. A district court has the authority under Federal Rule of Criminal Procedure 7(f) to direct the government to file a bill of particulars. "A bill of particulars can be used to ensure that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges, to prepare a defense, and perhaps also to be protected against retrial on the same charges." United States v. Butler, 822 F.2d 1191, 1193 (D.C. Cir. 1987). "Yet if the indictment is sufficiently specific, or if the requested information is available in some other form, then a bill of particulars is not required." Id.

The Government argues that its indictment is sufficiently specific. Count two of the indictment identifies a time period for the alleged conspiracy (April to August 2006) and at least three countries where the defendants acted in furtherance of the conspiracy (Guatemala, El Salvador, and Panama). It also specifies the object of the conspiracy, the statutes violated by the

---

[8] Del Cid Morales testified that he did not know about his Fifth Amendment right to remain silent until he received the Miranda warnings, and this Court has discounted his testimony with respect to the timing of the warnings.

conspiracy, and the mens rea required by those statutes. Although the indictment in this case is relatively spare, it is nonetheless sufficient to enable defendants to understand the charges against them and to prepare a defense. Indeed, the court of appeals recently affirmed the denial of a bill of particulars in response to an indictment containing this exact type and amount of information. See Mejia, 448 F.3d at 445.

Defendants' argument that the indictment must list overt acts in furtherance of the alleged conspiracy is unavailing. The D.C. Circuit rejected this very argument in Mejia: "Although the indictment did not allege any overt acts, the district court correctly found that the language of [§] 963 does not call for any to be set forth in an indictment, nor do any have to have been committed in order for a § 963 violation to be proven.'" Id. at 445 (internal quotation marks and alterations omitted); see also, e.g., United States v. Grammatikos, 633 F.2d 1013, 1023 (2d Cir. 1980) ("Unlike the general conspiracy statute, schemes to import or distribute controlled substances are the subjects of specifically drawn statutes, and the rule in this and other circuits is that overt acts in furtherance of such specifically prohibited agreements need be neither pleaded nor proven." (citation omitted)). Accordingly, defendants' motion is denied.

## III.    Motion for Severance of Counts

Finally, defendants have asked this Court to sever the two counts of the indictment. Rule 14 of the Federal Rules of Criminal Procedure provides: "If the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the

defendants, or prevent the jury from making a reliable judgment about guilt or innocence."

Zafiro v. United States, 506 U.S. 534, 539 (1993).

At this time, neither of the two defendants charged under count one of the indictment is in United States custody. The Government has represented to the Court that it believes one of those defendants (Bourdet) is dead and the other (Serrano) may never be captured. In other words, there is a significant likelihood that the motion for severance will be moot at the time of trial. The Court will therefore defer ruling on the motion unless and until circumstances change with respect to defendant Serrano prior to trial.

## CONCLUSION

For the reasons explained above, the Court denies defendants' motions to suppress and for a bill of particulars and defers ruling on defendants' motion for severance.

## ORDER

Upon consideration of the parties' motions and supporting memoranda, evidence presented at the suppression hearing, and the entire record herein, it is this 14th day of March, 2007, hereby

ORDERED that defendant Constanza Bran's motion to suppress is **DENIED**; it is further

ORDERED that defendants Del Cid Morales and Mejia's motion to suppress is **DENIED**; and it is further

ORDERED that defendants' motion for a bill of particulars is **DENIED**.

**SO ORDERED**.

                                             /s/ John D. Bates
                                                JOHN D. BATES
                                    United States District Judge